**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**ROBERT DAWLEY,**
                    ***Plaintiff,***

-vs-                                                    **Case No.  6:07-cv-872-Orl-DAB**


**NF ENERGY SAVING CORP. OF**
**AMERICA, and GANG LI,**
                    **Defendants.**
_____

**MEMORANDUM OPINION AND ORDER**

This cause came on for consideration following a bench trial in this breach of contract action,

which is before this Court on diversity jurisdiction.[1]  The Court has reviewed the evidence and the

applicable legal authorities and, upon due consideration, makes the following findings of fact and

conclusions of law.

***PROCEDURAL BACKGROUND***

The pleadings and papers filed by the parties in this case are exceptionally convoluted, as the

docket reflects.  Following several unsuccessful pleading attempts, Plaintiff, appearing *pro se*, alleged

in his Second Amended Complaint a series of breach of contract claims against Defendant NF Energy

Savings Corp. of America (herein Defendant or NFES), formerly known as Diagnostic Corporation

of America (herein "the company").[2]  The defense had its own difficulties; filing a Second Amended

Answer, Affirmative Defenses and Counterclaims against Plaintiff and Sam Winer (herein "Winer"),

_____

[1]Title 28 U.S.C. 1332.  The parties consented to the jurisdiction of the United States Magistrate Judge.

[2]The original Complaint named an additional Defendant, but Plaintiff dropped his claim against Gang Li, a Chinese national, for failure to obtain service (Doc. No. 59, p. 2. *See also* Doc. No. 75 at note 4).  Mr. Li, however, appeared as a self-proclaimed Defendant and Counter-Plaintiff via the Second Amended Answer (Doc. No. 104).  As such, it appears that Mr. Li has waived any objection to inadequate service and has consented to be reinstated as a Defendant.  As a practical matter, Plaintiff has not stated any claims against Mr. Li, and , as set forth herein, the Counterclaim was abandoned at trial, so his status is of no moment.

former President of the company, asserting claims for fraud, fraudulent concealment, declaratory judgment, breach of contract, violation of "Civil RICO," and "conspiracy to engage in a pattern or racketeering enterprise." (Doc. No. 104). This pleading added Gang Li as Defendant and Counterclaimant.   Shortly thereafter, Defendants voluntarily dismissed certain claims (Civil RICO and conspiracy) against Winer (Doc. No. 118), and Winer successfully moved to compel arbitration of the remaining claims against him (Doc. No. 143).

On the eve of trial, Defendant voluntarily dismissed the fraud and Civil RICO counterclaims against Plaintiff (Doc. No. 155), leaving a remaining count for fraudulent concealment (Count IV) and for a declaratory judgment (Count II).  At trial, Defendant presented no evidence specific to the fraudulent concealment count of the counterclaim.  The parties presented evidence with respect to the matters raised in the Second Amended Complaint and rested on the briefs, without argument.

### FACTUAL BACKGROUND

Plaintiff has alleged breach of four contracts between Plaintiff and the corporate Defendant, successor to the company.  Although the testimony and documentary evidence is shockingly informal, considering that this was and is a public company and hundreds of thousands of dollars were invested in or loaned to the company by Plaintiff, the case can be summarized as follows.  Plaintiff, an elderly man who testified that he was a retired engineer, made loans to the company, bought stock in the company, and entered into several agreements with the company, as detailed below.  The company never made any money and, in August 2006, the company was, in effect, sold to Gang Li (and its name changed to Defendant NF Energy Savings Corp. of America) and in the process, Plaintiff's ownership interest in the company was diluted considerably.  Prior to the sale, Winer, as President

of the company,[3] converted Plaintiff's Promissory Notes to stock, deemed all other agreements with Plaintiff to be "canceled," and reported the cancellations in SEC filings. Defendant Li therefore purchased the company without knowledge of the claims Plaintiff had against the company. Plaintiff now seeks to enforce his contracts with the company and recover damages.

*Conversion of Notes to Stock (Contract One)*

In 2004, Winer and two unnamed partners created a start up company and began to look for "investors." In the summer of 2004, Plaintiff was approached by a salesman from the company and eventually met with Winer. The business of the company was allegedly to purchase MRI centers, although the company never did so and, at all times relevant, had no assets other than the public "shell."

Apparently, Winer's presentation was impressive, because in August 2004, Plaintiff, entered into a Convertible Secured Promissory Note, wherein Dawley loaned the company (then known as Global Broadcast Group, Inc., according to the documents) $200,000 at a rate of 12% interest (Defendants Exhibit 12). The Note provided that the loan amount shall "at Payee's option be payable quarterly or at Maturity Date in whole or in part in cash or in shares of Maker's common stock at a price of $0.25 per share." The Note also includes the following provision:

> Maker further acknowledges that Payee shall be entitled to all customary anti dilution protection, information rights, and voting rights on an "as exercised" basis.

According to the document, the Maturity Date was September of 2005. The parties testified that some interest payments were made with respect to this Note.

A month later, on September 7, 2004, Dawley and Winer (on behalf of the company) entered into another Promissory Note, for another $200,000, on identical terms (Defendants Exhibit 11).

---

[3]The Quarterly Report filed with the SEC on August 21, 2006, lists Winer as Chief Executive Officer, Chief Financial Officer, Secretary and Chairman of the Board Of Directors. (Defendants Exhibit 16).

On October 7, 2005, the parties, in documents entitled Addendum to Convertible Secured Promissory Note, "renewed" the Notes, extending the maturity date to September 30, 2006 (Defendants Exhibit 13 and 14).  The Addenda included an option to convert to stock at  $0.10 a share, purportedly to better reflect the loss in value.  Some interest payments continued to be paid, albeit occasionally "in arrears." (Testimony of Winer).

Plaintiff refers to both the original Notes and the Addenda as one (and the first) "contract."

In March 2006, the company was not doing well, and Winer was trying to secure a buyer.  As buyers did not want a company with outstanding Promissory Notes on the books, Winer approached Plaintiff to convert the Notes into stock.  Although the Notes called for conversion rates of 10 cents a share, Plaintiff testified that he sent emails agreeing only to five cents a share (Plaintiff's Exhibit C 8).

At trial, the parties' testimony differed with respect to the conversion.  Plaintiff stated that he agreed to convert (thereby losing his cash flow) only if the company were to be sold to a particular buyer, and when the company was not sold to this buyer, he considered the conversion null and void. (Plaintiff's Exhibit A-6).  Winer disputes this.  Regardless, in March 2006, the Notes and Addenda were, indeed, converted and in exchange for the $400,000 Notes, Plaintiff received 4 million shares of stock in the company.  The conversion rate was ten cents a share.  Plaintiff asserts the conversion of the Notes at the "wrong" rate is the first breach of contract and asserts that he is owed an additional 4 million shares of the company, to reflect the correct rate of five cents a share.

*Consulting Agreement (Contract Two)*

On October 7, 2005, the same date the Notes were renewed, the parties also entered into a Consulting Agreement (Plaintiff's Exhibit C11), which was to become effective "if and when the Promissory Notes . . . are converted into stock."  The Agreement provided:

-4-

When the notes are converted in accordance with the terms of the notes, Robert Dawley shall be engaged to provide consulting services for the company. The Consulting Agreement will pay $60,000 yearly, of which $48,000 will be in cash and $12,000 in stock, and is to be paid quarterly. The stock price is calculated at 50% of the lowest market price during the quarter. . . .This Consulting Agreement cannot be voided and remains in effect until Mr. Dawley decides to abandon it.
All stock shares issued by the company in connection with this Consulting Agreement shall have anti-dilution rights.
In addition, Mr. Dawley will purchase 725,000 shares on October 7 at $0.05 cents per share ($36,250) of which $14,567 will come from the last quarters' interest and a new check for $21,683 for the remainder.

According to Plaintiff, and not disputed by Winer, this Agreement was entered into in recognition of the fact that any conversion would mean that Plaintiff was giving up the 12% interest cash flow Plaintiff enjoyed under the Notes. Plaintiff testified that he was to provide electronic consulting services to the company, if they did, in fact, purchase the MRI facilities Winer was allegedly negotiating for.

 It is undisputed that the company never performed under this contract.

 This is Plaintiff's alleged second breach of contract. Plaintiff asserts that he is owed $10,000 per month for life "to replace the loss of note 12% interest after conversion to stock." (Doc. No. 141).

*Lock-up Agreement (Contract Three)*

On May 20, 2005, the parties entered into a Lock-Up Agreement, whereby Plaintiff and his wife (who were acquiring 375,000 shares of stock from an unaffiliated shareholder) agreed not to sell any shares for a period of six months (until November 20, 2005) (Plaintiff's Exhibit C13).  In an Addendum to the Lock-up Agreement, dated May 17, 2005, although signed May 20, 2005, Winer, on behalf of the company, agreed that:

Since the Dawleys are postponing their right to sell their shares at the current market price of $0.50, the company will issue additional stock to the Dawleys, if they are unable to sell the shares covered in the Lock-up Agreement, after the expiration of the Lock-up period, for a minimum of  $0.40 per share. This pledge for additional shares

shall extend for one-year from November 20, 2005, the expiration of the date of the
Lock-up Agreement.

(Plaintiff's Exhibit C-14).

Winer testified that when the company was sold, this agreement was "cancelled."  Plaintiff

asserts that the failure to "buy back" the shares at the fixed price is the third breach of contract.

*Anti-dilution Protection (Contract Four)*

On October 7, 2005 (signed October 10, 2005 by Winer), the parties entered into a Document

of Understanding which reiterated most of the prior understandings summarized above, and included

the provision that "All stock shares issued by the company will be dilution proof." (Plaintiff's Exhibit

C-12).  In fact, they were not.

Winer testified that he told Plaintiff he would have anti-dilution so that he would be in the

same position when he converted the Notes, but as for the stock, "you can't willy nilly give out public

stock" and "I would agree if we could do that, but the SEC attorneys told me we couldn't."  Thus, the

Court finds that Winer entered into this agreement even though he considered it to be meaningless and

unenforceable.  Plaintiff asserts the unilateral cancellation of this agreement as his fourth breach of

contract.

*The Sale of the Company*

All told, Plaintiff purchased two million shares of the company, 1.1 million of which was

converted at the time of the sale in a reverse split (35 to 1), leaving Plaintiff with 145,800 shares of

Defendant's stock, plus Plaintiff also owns 900,000 in restricted shares that did not convert.[4]  Plaintiff

claims that prior to the sale, he was a major stockholder in the company (48% interest).  Winer

---

[4]Plaintiff claims he sold 5,000 shares of stock.  The company records reflect that Dawley owns a total of only 145,714
shares (Defendants Exhibit 17).  For present purposes, the exact number of shares owned is not directly relevant to the issues
presented.

testified that Plaintiff owned no more than a 24-25% interest.  Regardless, Plaintiff's interest was never recognized as controlling in the SEC filings of the company.

In August 2006, Gang Li entered into a Stock Purchase Agreement with the company for $350,000, and newly issued Treasury Stock gave Li a 60% controlling interest (Defendant's Exhibit 16).  Although testimony regarding the current share price varied, it appears that the stock is trading at approximately 35 cents a share.  Plaintiff seeks, as damages, the issuance of new stock to bring him up to the 48% interest he claims he lost due to dilution and for failure to honor the guaranteed buy back, and $10,000 a month plus 12% interest since March 8, 2006 under the Consulting Agreement (*See* Doc. No. 141).  Defendant contends no damages are due as the Notes were converted at the rate provided, the Consulting Agreement is invalid, the anti-dilution agreement is unenforceable and Defendant "has made no admissions to non-conformance to buyback contract." (Doc. No. 141).

For the reasons set forth herein, the Court finds largely for Defendant with respect to the Notes, the anti-dilution agreement and the buy back provision, but finds for Plaintiff, in part, with respect to the Consulting Agreement.

### ISSUES AND ANALYSIS

As the case is before the Court on diversity jurisdiction and all of the contracts were entered into in Florida,[5] the Court looks to Florida law for the applicable legal standards.  It is axiomatic that under Florida law, the elements for an action for breach of contract are: (1) a valid contract; (2) a material breach of the contract; and (3) damages resulting from the breach. *Beck v. Lazard Freres & Co., LLC,* 175 F. 3d 913 (11th Cir. 1999) (applying Florida law); *Warfield v. Stewart,* 2007 WL 3378548, 6 (M.D. Fla. 2007) *citing Rollins, Inc. v. Butland*, 951 So.2d 860, 876 (Fla. 2nd DCA 2006) (parties must also prove performance of their obligations under the contract in order to maintain a

---

[5]The Notes specify that they are to be governed by Florida law.

cause of action for breach of contract.)  Further, "[i]t is well-settled that when contractual language

is clear and unambiguous, the court cannot indulge in construction or interpretation of its plain

meaning." *Future Tech Intern., Inc. v. Tae Il Media, Ltd.*, 944 F.Supp. 1538, 1565 (S.D. Fla.1996),

*citing Hurt v. Leatherby Insurance Company*, 380 So.2d 432 (Fla.1980).  Even if the language is

ambiguous, construction of a contract is ordinarily a matter of law for the court, regardless of however

ambiguous, uncertain, or difficult its terms may be.  *Medical Store, Inc. v. AIG Claim Services, Inc*.,

2003 WL 25669175, 2  (S.D. Fla. 2003).  As noted by the Southern District:

> Additionally, the Document must be construed in a way that is reasonable, fair and just
> to both parties. *James v. Gulf Life Ins. Co.*, 66 So.2d 62, 63 (Fla.1953.) Thus, if the
> language of a contract is contradictory, obscure, or ambiguous, or its meaning is
> doubtful, so that it is susceptible to two construction, one of which makes it fair,
> customary, and such as a prudent man would naturally execute, while the other makes
> it inequitable, unnatural, or such as a reasonable man would not be likely to enter into,
> then the reasonable, logical, and rational interpretation should be adopted. *Id.; Accord
> Morton v. Ansin*, 129 So.2d 177, 180-181 (Fla. 3d DCA 1961). Moreover, intent of the
> parties with respect to any feature of the contract must be determined from an
> examination of the whole contract. *Lalow v. Codoma*, 101 So.2d 390, 393 (Fla.1958);
> *Paddock v. Bay Concrete Industries. Inc*., 154 So.2d 313, 315 (Fla. 2d DCA), *Hoffman
> v. Robinson,* 213 So.2d 267, 268 (Fla. 3d DCA 1968). Thus, it is not enough to look
> at an isolated phrase or provision of the contract; all of the parts are to be compared,
> analyzed and construed with reference to each other. *Id*. Finally, the court is to
> consider the surrounding circumstances under which the agreement was made in
> ascertaining the parties' intentions. *Clark v. Clark,* 143 La. 841, 79 So. 426, 428
> (Fla.1955).

The Court applies the foregoing principles, together with the defenses unique to each contract,

below.

### Conversion of Notes to Stock (Contract One)

The Court finds that the Notes were valid contracts, but the alleged informal modification as

to conversion rate was not.  The evidence was undisputed that the Notes were converted at the price

set forth in the most recent Addenda.  Thus, Plaintiff's claim is not for breach of the written Notes,

but for breach of an alleged *subsequent* modification of the Notes, expressed by Plaintiff in conversation and emails to Winer (Plaintiff's Exhibits C-6 and C-8).[6]

Although the rule in Florida is well established that a written contract may be "modified by an oral agreement if the latter has been accepted and acted upon by the parties in such manner as would work a fraud on either party to refuse to enforce it." *King Partitions & Drywall, Inc. v. Donner Enters., Inc*., 464 So.2d 715, 716 (Fla. 4th DCA 1985), *Pathway Financial v. Miami Intern. Realty Co.*, 588 So.2d 1000, 1005 (Fla. 4th DCA 1991), there is no evidence that the company accepted or acted upon Plaintiff's emails or oral request to change the rate. Winer testified that he considered Plaintiff's emails to be mere "proposals."[7] Although Plaintiff claims that it was understood that he would convert the Notes only at five cents a share, there is no writing signed by *both* parties to that effect, an important omission considering that the parties had previously changed the conversion rate by formal written Addenda. The evidence does not support a meeting of the minds to modify the Notes to reflect a new conversion rate.

The company performed its obligations under the Notes with respect to the conversion rate, and the Court finds insufficient evidence of a later modification of the terms. Defendants prevail on this claim.

### Consulting Agreement (Contract Two)

There is no question that the Consulting Agreement was considered by *both* Plaintiff and the company to be a valid agreement at the time it was entered into. The agreement was noted in the SEC

---

[6]Thus, the parol evidence rule (prohibiting evidence of prior or contemporaneous oral understandings to vary terms of written contracts) has no application here.

[7]Winer's credibility as to Plaintiff's relationship with the company is not good. Nonetheless, had the parties intended to agree to such a significant change in the conversion rate, it would have been better documented than the record presented here.

filings and the evidence at trial, even from Winer, was that both parties considered it to be binding. Nor does the company dispute that it failed to perform under the agreement. Although the SEC filing, dated March 2006, indicated that the contract was "mutually" cancelled, the Court finds this assertion to be untrue.[8]  There is no record of any written cancellation from Plaintiff, nor did the company introduce any evidence of writings it sent to Plaintiff memorializing any oral agreement to cancel the contract.   Rather, the Court finds that Winer ignored Plaintiff's emails and phone calls, which expressly note that "the Lifetime Agreement remains in effect" (Plaintiff's Exhibit A6), and took it upon himself (as President, CEO, CFO, and Chairman of the Board) to unilaterally declare the agreement cancelled, in order to sell the company.

At issue is whether this unilateral cancellation (even assuming the cancellation is not just a post hoc rationalization for failure to perform) is effective, and if not, whether, as Defendants contend in their defense to the claim and in their counterclaim for declaratory judgment, the Agreement is otherwise unenforceable under Florida law.

At trial, Defendants called as a witness the lawyer it hired in connection with the purchase of the company.  Attorney Jeffrey Febberlio testified that Gang Li relied on the representations made in the SEC filings that the contract had been *mutually* cancelled.  The Court finds this to be of no moment.  To the extent the SEC filings contain a blatant misrepresentation, there is no evidence that *Plaintiff* was responsible for same, and, indeed, Plaintiff testified that he was never contacted by the purchaser with respect to this or any other matter.  To the extent Defendants were the victims of a

---

[8]Although Winer provided some testimony that could be taken as claiming a mutual cancellation had occurred, he was, as to this evidence, vague, self-contradictory and unworthy of belief.  Plaintiff's denial that a cancellation occurred is logical and is supported, in some degree, by his contemporaneous e mails.  Notably, as well, despite the SEC filing, Defendants at trial appeared to rely on a theory of unilateral rather than mutual cancellation.

misrepresentation made by Winer, that matter is not presently before the Court.  Plaintiff's cause of action is not precluded by any misrepresentation made by Winer to the SEC or Gang Li.

Attorney Febberlio also testified that in his expert opinion, the company's Board of Directors had authority to unilaterally cancel contracts and agreements incident to a sale of assets,[9] citing *Broad v. Rockwell Intern. Corp.,* 642 F.2d 929 (5th Cir. 1981).  This is an overstatement of the holding of that case and is otherwise inapplicable to the facts of this case.  In *Broad,* the Fifth Circuit, applying New York law, held *inter alia*, that the language of an indenture agreement permitted a successor corporation and trustee to execute a supplemental indenture providing for postmerger conversion rights of debenture holders allowing only conversion into cash.  To the extent this decision could be interpreted to allow a successor corporation to alter rights of existing debenture holders, it does not stand for the general proposition that a successor corporation can simply eliminate a creditors' rights, absent the provision of value.

Here, it is undisputed that, assuming the contract is enforceable, it entitled Plaintiff to payments of $60,000 a year, in cash and stock.  This contractual right was not *altered* by the Board (such as by payment solely in stock) but, rather, summarily extinguished, with no value being delivered to Plaintiff whatsoever.  A surviving corporation simply does not have authority to ignore debts and obligations, as Defendants themselves recognized, in that the purchase price paid for the company was used to pay off creditors.[10]  The supposed unilateral cancellation was ineffective, as a matter of law.

_____

[9]As noted above, this theory is inconsistent with the assertion that a mutual cancellation had occurred.

[10]Indeed, one of the creditors was Plaintiff, who received $8,800 in past due interest on his converted Notes, following the sale of the company.

Defendants' last contention is that the contract itself is invalid under Florida law for failure of a condition precedent, lack of consideration, want of mutuality, and a general prohibition against enforcement of lifetime employment contracts.

Defendants assert that the contract never came into force because the condition precedent (the purchase of MRI centers) never occurred and there is no consideration or mutuality, as Plaintiff never provided consulting services. As set forth above, the condition precedent for the agreement was, as stated in the agreement itself, the conversion of the Notes, which *did* occur. The agreement does not mention the purchase of MRI centers nor that the company's obligations to Plaintiff were conditioned on such a purchase. In fact, the company did not interpret the agreement as being conditional on the provision of consulting services, but rather, on the conversion of the Notes and the purchase of additional stock. As set forth in Defendants' Proposed Findings of Fact and Conclusions of Law (Doc. No. 159), the company made the following entry in its annual report for the period ending December 31, 2005:

> Item 12. Certain Relationships and Related Transactions.
> a) During August 2004 and September 2004, we entered into two loan agreements with an unrelated third party in the amount of $200,000 each. Each note bears interest at 12% per annum and is secured by 800,000 restricted shares of the Company's common stock. At the note holder's option, each note is convertible into shares of the Company's common stock equal in number to the amount determined by dividing each $1,000 of note principal to be converted by the Conversion Price at any time during the term of the note, at a Conversion Price of $0.25. The notes were due in full, together with accrued interest, on September 9, 2005 and October 6, 2005, respectively. In October 2005, the terms of the loans were extended to September 30, 2006. In addition to extending the terms, the Conversion Price was adjusted to $0.10 and the number of shares pledged to secure the loan was increased to 2,000,000. *At the same time, we entered into a consulting agreement with the noteholder. The commencement date of the agreement shall begin if and when the notes are converted. Upon commencement of the agreement, the consultant shall receive annual compensation of $60,000 payable in cash and up to $12,000 in stock on a quarterly basis. Concurrent with this agreement, we issued 725,000 shares of common stock at a purchase price of $0.05 per share to the noteholder.*

-12-

(emphasis added).  Moreover, Plaintiff testified without contradiction that the agreement was designed to compensate him for the loss of the cash flow of 12% interest he was receiving on the Notes.  Under Florida law, this is adequate consideration.  *In re Alchar Hardware Co., Inc.*, 764 F.2d 1530, 1534 (11th Cir. 1985) (detriment to a promisee, such as forbearance to enforce a legal right, constitutes adequate consideration).

Defendants' lack of mutuality argument is similarly flawed.  Even if the Court were to find that the contract lacked mutuality in that only Plaintiff could terminate it, such a finding would not be fatal in this context.  Florida follows the rule that "[a]lthough a contract is lacking in mutuality at its inception, such defect may be cured by the subsequent conduct of the parties." *City of South Miami v. Dembinsky*, 423 So.2d 988, 989 (Fla. 3 DCA 1982) (internal citation omitted). "Want of mutuality is no defense in the case of an executed contract, and a promise lacking mutuality at its inception becomes binding on the promisor after performance by the promisee." *Id.*  Clearly, the company entered into a contract with Plaintiff, designed to induce him to convert his Notes and infuse additional monies into the company through the purchase of additional stock.  Following his purchase of the additional stock and conversion of the Notes, the contract became binding on the company, as the company itself recognized in the SEC filing quoted above.

This leaves the final contention as to the Consulting Agreement–that it is invalid and unenforceable under Florida law as it is a lifetime employment contract.  While Defendants are correct in noting that lifetime employment contracts are disfavored, generally, as indefinite, "Florida courts will enforce a contract for lifetime employment . . . where its terms are sufficiently definite to confirm the intent of the parties to form a lifetime employment agreement and to make enforcement feasible, and where, in addition to the employee's services, there is some other substantial consideration given by the employee that is an integral part of the contract." *Hesston Corp. v. Roche,* 599 So.2d 148, 151

-13-

(Fla. 5th DCA1992), *citing Chatelier v. Robertson*, 118 So.2d 241, 244 (Fla. 2d DCA1960).

"Examples of consideration that have been found sufficient to support a lifetime employment promise are: release of an employer from a claim for injuries, conveyance of property to the employer or relinquishment of a comparable lifetime-guaranteed job." *Hesston Corp,* 599 So.2d at 152. Here, substantial consideration was given by Plaintiff to the company in the form of the purchase of additional stock and the conversion of the Notes (and thus, the loss of the cash flow of 12% interest on $400,000) six months earlier than the maturity date. As such, even if the Court were to construe the agreement as an employment contract, the contract is not necessarily "illegal" or *per se* "invalid" as asserted by Defendants.

That said, the Court cannot agree that the Consulting Agreement is, in fact, an enforceable employment contract for life as "the terms are not sufficiently definite to make enforcement feasible." If, in fact, the agreement were construed to be an employment agreement, it necessarily follows that Plaintiff was to perform certain duties, none of which are set forth in the agreement. Further, none can be implied as both parties testified that Plaintiff never performed any consulting services under the Consulting Agreement, not because he did not wish to, but rather, because he was not asked to before the company abandoned the contract. Thus, the Court has no evidence of past consulting services provided by Plaintiff, from which to imply continuation of permanent employment, and the testimony regarding *contemplated* services relates to a business the company is no longer is pursuing. As the terms of employment are not sufficiently definite, enforcement as an *employment* contract is not feasible. The foregoing is of no moment, however, as the Court finds that the Consulting Agreement was *not* an employment agreement, despite its title.

The Court finds, upon review of the evidence, that the agreement to pay Plaintiff $48,000 a year (plus stock) for life was not for performance of any such future services, but was an attempt by

-14-

the parties to secure a portion of the status quo should conversion of the Notes be necessary.  The evidence establishes that Winer, on behalf of the company, would have (and did) promise almost anything to Plaintiff, in order to get him to agree to convert the Notes.

Applying the foregoing principles of contract construction and looking at all of the surrounding circumstances to determine the parties' intentions, the Court finds that the parties intended to come up with a way to creatively finance the company without Plaintiff losing his income stream from the interest payments on the Notes.[11]  The amount Plaintiff was due to receive on an on-going basis ($48,000 in cash) coincides with the 12% interest rate payments he had been receiving under the Notes.  As the company was not set up to issue, in essence, a preferred stock that paid a $48,000 annual cash dividend, the parties settled on the payment for "consulting" provision.[12]  Viewed thus, there is nothing inherently unenforceable in this context.  There is no doubt that Plaintiff has performed on his portion of the contract obligations, in that he has purchased stock and converted his Notes, all based on a written promise by the company to continue the income stream.  Defendants, however, have not performed in any way (beyond providing the initial stock), resulting in damage to Plaintiff.

"A court of equity has the power to reform a written instrument where, due to a mutual mistake, the instrument as drawn does not accurately express the true intention or agreement of the parties to the instrument." *Providence Square Ass'n v. Biancardi*, 507 So.2d 1366, 1369 (Fla.1987).  "Reformation also is proper when there is a mistake on the part of one side of the transaction and inequitable conduct on the part of the other side." *Goodall v. Whispering Woods Center, L.L.C.*  990

---

[11]The Court offers no opinion as to the propriety of these efforts under the securities laws or proper accounting principles.  It is evident that strict compliance with those requirements was not a high priority for Winer at that time.

[12]The additional compensation contemplated under the agreement would have been payment for actual services, conditioned on the MRI business being acquired.  As that never occurred, the additional compensation is not owed.

So.2d 695, 699 (Fla. 4th DCA 2008), *citing Providence Square*, 507 So.2d at 1372 n. 3 ; *Noack v. Blue Cross Blue Shield of Fla., Inc.*, 859 So.2d 608, 610-611 (Fla. 1st DCA 2003).

While it is true that neither Plaintiff's papers nor Defendants' purport to seek equitable relief explicitly, the Court finds the remedy to be implicit in the papers and the proof.[13]  Defendants counterclaimed for a declaratory judgment, an equitable action, and demanded an Order declaring that the Consulting Agreement was not a valid and binding contract, that Plaintiff had no right to seek any of the monies he claims are owed under the agreement, and for an order "providing for any other relief that this Court deems appropriate." (Doc. No. 104, pp. 12-13).  The Court finds the remedy of reformation of the contract to be particularly appropriate here.

Applying the above, the Court finds that the manner in which the parties structured and documented their relationship is, in various respects, not literally enforceable.  Although Plaintiff has sued, in essence, for specific performance of this contract, if such performance is, as Defendants urge, unavailable under the law, Plaintiff is not without recourse in equity.  Because the parties partially performed and changed their positions relying upon their agreement, the Court must reform their agreement and fashion a remedy that reasonably provides the parties the intent of their bargain, taking into account the circumstances, Defendants' failure to perform and resolving uncertainty as to the terms and enforceability of parts of the agreement.

Defendant asserts that no remedy is due, in essence contending that the contract was rescinded. The fundamental requirements necessary to state a cause of action for rescission of contract are: (1) the character or relationship of the parties; (2) the making of a contract; (3) the existence of fraud, mutual mistake, false representation, impossibility of performance, or other ground for rescission or

---

[13]The Court is charged with reviewing Plaintiff's *pro se* filings liberally, and Rule 15(b)(2), F.R.Civ.P. Allows the Court to treat the pleadings as conformed to the issues actually tried by the parties.

-16-

cancellation; (4) the party seeking rescission had rescinded the contract and notified the other party

to the contract of such rescission; (5) if the moving party has received benefits from the contract, he

should further allege an offer to restore these benefits to the party furnishing them, if restoration is

possible; and (6) the moving party has no adequate remedy at law. *Crown Ice Machine Leasing Co.*

*v. Sam Senter Farms, Inc.*, 174 So.2d 614, 617 (Fla. 2d DCA 1965); *see also Bland v. Freightliner*

*LLC*, 206 F.Supp.2d 1202, 1206 (M.D. Fla. 2002).   Although Defendant claimed to have unilaterally

cancelled the contract, and has resorted to a request for equitable relief to declare the contract

unenforceable, there is no showing of compliance with the required restoration back to Plaintiff of the

benefits received by the company under the contract.  "Rescission is not available as a matter of right.

Relief by way of rescission lies within the sound discretion of the [trial] court, to be exercised

according to what is reasonable and proper under the circumstances of each particular case; and the

court will, in granting relief, impose such terms as it deems the real justice of the case to require, the

maxim being emphatically applied, he who seeks equity must do equity." *Billian v. Mobil Corp*,. 710

So.2d 984, 990 -991 (Fla. 4th DCA 1998) (internal citations omitted).  Real justice here demands that

Plaintiff  be restored to the position he was in prior to the conversion of the Notes.  To allow the

company to merely walk away from the contract would be unconscionable, and would not reflect what

the Court finds to be the parties' joint intent: to compensate Plaintiff for the loss of the 12% interest

income stream.

Put simply, Plaintiff was earning $48,000 on the $400,000 Notes and that cash flow ceased

when, at the company's urging, he converted his Notes to non-dividend paying stock, on the

company's promise (since reneged) to continue the income stream.  In order to restore him to his

previous position, therefore, the company must buy back the converted stock for $400,000, plus pay

Plaintiff 12% interest from the date of the conversion to the time of the re-purchase.  Upon tender of

-17-

this amount in full, the status quo will be restored, Plaintiff will have no further rights under the Consulting Agreement, and justice will be served.  To the extent the company cannot buy back or otherwise cancel the stock due to SEC or other legal restrictions, Plaintiff shall be entitled to retain the stock and shall receive judgment in the amount of $132,821.92 for past due interest (from March 8, 2006 to today), plus, Plaintiff is entitled to continued interest payments of $48,000 a year (payable quarterly, as agreed) unless and until the principal ($400,000) is repaid, at which time the converted stock shall be surrendered and no future payments shall be due.

### Lock-up Agreement (Contract Three)

The Court heard very little testimony on this issue, and the "contract" itself is so vague as to be unenforceable.  In the first place, the Court sees no provision for a "buy back."  Rather, the agreement provides that "the company will issue additional stock to the Dawleys, if they are unable to sell the shares covered in the Lock-up Agreement, after the expiration of the Lock-up period, for a minimum of $0.40 per share." There is no evidence that Plaintiff was unable to sell the subject shares following the expiration of the lock-up period, nor is there any provision for how much additional stock was to be issued as a consequence.  Absent these essential terms and proof of any resulting damages, Plaintiff's claim for breach of contract fails.

### Anti-dilution Protection (Contract Four)

There is no doubt that Winer agreed, on behalf of the company, that "All stock shares issued by the company will be dilution proof."  The evidence, however, reflects that at the time he made the statement, and at all times since, the company had absolutely no intention of keeping that promise, nor can such a promise be made in this way by a public company.  The provision does not purport to apply merely to Plaintiff's stock, but to *all* stock; nor does it specify if the anti-dilution is with respect to ownership percentage or economic dilution (with use of a formula to keep a shareholder "whole"

-18-

and to assure that specific values do not decline).  Moreover, as pointed out in the testimony of the

company's attorney, there is no proof that the stock itself was, in fact, diluted as, at the time of the

sale of the company, the stock was trading for a penny a share and the reverse split provided value

for stock that was essentially worthless.  Thus, to the extent Plaintiff seeks the issuance of additional

stock to retain his ownership percentage in the company, he is not entitled to recover on this claim.

### SUMMARY

The claims of this case can be summarized:

| Contract Terms | Issue | What Happened | Appropriate Relief |
|---|---|---|---|
| **1.** Plaintiff to get certain amount of stock | The conversion rate is disputed | Plaintiff received shares, at the Note rate | No additional shares are owed |
| **2.** with anti-dilution protection | The meaning of his "anti-dilution protection" is undefined and likely unenforceable for a public company | no anti- dilution protection and his ownership interest in the company remains indeterminate | Restore Plaintiff's principal and cancel his shares |
| **3.** Plaintiff to receive $48,000 for life in exchange for converting Notes | "lifetime" contracts disfavored | Plaintiff converted Notes, but has not received life payment | Award Plaintiff 12% interest until principal repaid |
| **4.** Plaintiff to receive $12,000 payable in stock annually as consultant compensation | condition precedent never occurred | Plaintiff has received nothing | No award is due |
| **5.** Company to issue additional stock if Plaintiff unable to sell shares at specified price | Plaintiff claims company obligated to "buy back" shares, but terms are undefined | Company did not buy back shares | No "buy back" is due |

As set forth above, the Court finds **for Plaintiff and against Defendants** in the amount of $400,000.00, plus prejudgment interest in the amount of $132,821.92 with continuing interest of $131.51 per day on the $400,000.00 obligation until it is paid.  Upon payment of the $400,000.00, Plaintiff shall surrender the stock he received at the conversion of the Notes, failing which, the company may cancel the stock.  Any payments or collection under the Judgment shall be credited first to interest. The Counterclaim is **DISMISSED** with prejudice for lack of proof.

The Clerk is directed to enter a final judgment under Rule 58, F.R.Civ.P. and to close the file. Plaintiff may recover taxable costs under 28 U.S.C. § 1920 by filing a Bill of Costs in accordance with the Rules.

**DONE** and **ORDERED** in Orlando, Florida on December 11, 2008.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties